UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

KAYEM FOODS, INC.,

        Defendant.

Civil No. 1:19-cv-11126

---

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action for penalties against Defendant Kayem Foods, Inc. ("Defendant") for violations of Section 112(r)(7) of the Clean Air Act ("CAA"), 42 U.S.C. § 7412(r)(7), at Defendant's food processing facility located in Chelsea, Massachusetts.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action and the Defendant, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and under 28 U.S.C. §§ 1331, 1345, and 1355.

3.      Venue is proper in this District under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c), and 1395(a), because the Defendant does business in, and these claims arose within, this judicial district.

4.     Notice of commencement of this action has been given to the Commonwealth of

Massachusetts pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## PARTIES

5.     Plaintiff is the United States of America, acting at the request of the EPA, an

agency of the United States.

6.     Defendant is a corporation organized under the laws of the Commonwealth of

Massachusetts and is doing business in this judicial district.

7.     Defendant is the operator of a facility located at 75 Arlington Street, Chelsea, MA

02150 (the "Facility") that handles, stores, and uses anhydrous ammonia in its industrial

refrigeration system.

8.     Defendant is a "person" within the meaning of Section 302(e) of the CAA, 42

U.S.C. § 7602(e).

## STATUTORY AND REGULATORY FRAMEWORK

9.     The purpose of Section 112(r) of the CAA is to provide requirements and

standards to prevent and minimize accidental releases of air pollutants.  42 U.S.C. § 7412(r)(1).

10.     The term "accidental release" is defined by CAA Section 112(r)(2)(A), 42 U.S.C.

§ 7412(r)(2)(A), to include an unanticipated emission of a regulated substance into the ambient

air from a stationary source.

11.     Anhydrous ammonia (also known as $NH_3$) is listed as a "regulated substance"

under Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3) and 40 C.F.R. § 68.130.

12.     Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), provides that the

Administrator of the EPA is authorized to promulgate regulations requiring owners or operators

of a stationary source at which a regulated substance is present in more than a threshold amount

to, among other things, prepare and implement a risk management plan to detect and prevent or minimize accidental releases of regulated substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment.

13.     EPA has promulgated regulations to implement Section 112(r)(7), codified at 40 C.F.R. Part 68, which require owners and operators of stationary sources that have more than a threshold quantity of a regulated substance in a process to develop and implement a risk management program that must be described in a risk management plan submitted to EPA and that includes, among other things, a management system, a hazard assessment, and an accident prevention program.

14.     A "stationary source" means, in relevant part, "any buildings, structures, equipment, installations or substance emitting stationary activities . . . from which an accidental release may occur."  CAA Section 112(r)(2)(C), 42 U.S.C. § 7412(r)(2)(C).

15.     "Process" is defined in 40 C.F.R. § 68.3 to mean "any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or any combination of these activities."  "Covered Process" means "a process that has a regulated hazardous substance present in more than a threshold quantity as determined under [40 C.F.R.] § 68.115."  40 C.F.R. § 68.3.

16.     A Process containing at least 10,000 pounds of anhydrous ammonia meets the threshold quantity under 40 C.F.R. § 68.130.

17.     The regulations at 40 C.F.R. Part 68 separate the covered processes into three categories, designated as Program 1, Program 2, and Program 3, and set forth specific

requirements for owners and operators of stationary sources with processes that fall within the respective programs.

18.     Pursuant to 40 C.F.R. § 68.10(d), a Covered Process is subject to Program 3 requirements if the process does not meet one or more of the Program 1 eligibility requirements set forth in 40 C.F.R. § 68.10(b), and if either of the following conditions is met: (a) the process is listed in one of the specific North American Industry Classification System codes found at 40 C.F.R. § 68.10(d)(1); or (b) the process is subject to the United States Occupational Safety and Health Administration ("OSHA") process safety management standards set forth in 29 C.F.R. § 1910.119.

19.     Pursuant to 40 C.F.R. § 68.12(d) the owner or operator of a stationary source that is subject to Program 3 prevention requirements must undertake certain tasks including, but not limited to: development and implementation of a management system (as provided in 40 C.F.R. § 68.15); the development and implementation of prevention program requirements, which include the compilation of process safety information, written standard operating procedures, training, a mechanical integrity program, management of change procedures, and pre-startup safety review procedures (as provided in 40 C.F.R. §§ 68.65-68.87); and the development and implementation of an emergency response program as provided in 40 C.F.R. §§ 68.90-68.96.

20.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), provides that the Administrator of EPA shall, in the case of a person who is the owner or operator of a major stationary source, and may, in the case of any other person, whenever such person violates any requirement or prohibition of Subchapter I of the CAA (42 U.S.C. §§ 7401-7515), commence a civil action for injunctive relief and to assess and recover a civil penalty of up to $25,000 per day for each such violation.  Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461,

the Debt Collection Improvements Act of 1996 ("DCIA"), 31 U.S.C. § 3701, and EPA's Civil

Monetary Penalty Inflation Adjustment Rule ("Inflation Adjustment Rule"), 40 C.F.R. Part 19,

promulgated pursuant the DCIA, Defendant is liable for a civil penalty of up to up to $37,500 per

day for each violation of Subchapter I of the CAA that occurred from January 12, 2009 through

November 2, 2015, and up to $99,681 per day for each violation that occurred on or after

November 2, 2015.  See 84 Fed. Reg. 2,056, 2,059 (Feb. 6, 2019).

## GENERAL ALLEGATIONS

21.     At all relevant times, Defendant operated the Facility.

22.     At all relevant times, the Facility has been a "stationary source" as defined in

CAA Section 112(r)(2)(C), 42 U.S.C. § 7412(r)(2)(C).

23.     At all relevant times, Defendant maintained a refrigeration system at the Facility

and that system utilized, processed, handled, or stored anhydrous ammonia, a "regulated

substance" under CAA Section 112(r)(3), 42 U.S.C. § 7412(r)(3).

24.     EPA conducted an inspection of the Facility on July 21, 2014 (the "Inspection").

As a result of what was observed at the Inspection or the review of documents provided at the

time of the Inspection or thereafter, EPA identified a number of violations of the CAA, as

communicated to Defendant in a letter, dated September 23, 2015.

25.     The regulations at 40 C.F.R. Part 68, promulgated pursuant to Section 112(r)(7) of

the CAA, 42 U.S.C. § 7412(r)(7), are applicable to owners and operators of stationary sources at

which a regulated substance is used in a process and is present in an amount more than a

threshold quantity.  Defendant's refrigeration process at the Facility is subject to the

requirements of 40 C.F.R. Part 68 because a regulated hazardous substance (anhydrous

ammonia) is present in more than a threshold quantity (10,000 pounds).

26.     Defendant's process is not eligible for Program 1 under 40 C.F.R. § 68.10(b) because the distance to a toxic endpoint for a worst-case release assessment is greater than the distance to a public receptor.

27.     Defendant's process is subject to requirements of 40 C.F.R. Part 68 found at Subpart D - Program 3 Prevention Program, under 40 C.F.R. § 68.10(d), because it is not eligible for Program 1 and is also subject to the OSHA process safety management standards set forth in 29 C.F.R. § 1910.119, which apply to any process which involves a chemical at or above a threshold quantity, which, in the case of anhydrous ammonia, is 10,000 pounds.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF – VIOLATION OF 40 C.F.R. § 68.25(a)

*Failure to Properly Perform Worst-Case Release Calculations*

28.     40 C.F.R. § 68.25(a) requires Defendant to develop a worst-case release accidental release scenario that is estimated to create the greatest distance in any direction from the Facility that ammonia would be present in the atmosphere at 0.14 mg/L.

29.     40 C.F.R. § 68.25(b) provides that the quantity of the worst-case release of ammonia shall be based on the greater of, (1) for substances in a vessel, the greatest amount held in a single vessel, taking into account administrative controls that limit the maximum quantity, or (2) for substances in pipes, the greatest amount in a pipe, taking into account administrative controls that limit the maximum quantity.

30.     The worst-case scenario set forth in Defendant's June 13, 2011 Risk Management Plan for the Facility, which was in effect at the time of the Inspection, assumed a release of

6

11,500 pounds and a release rate of 300 pounds/minute.  If the 11,500-pound release figure was

correct, Defendant should have assumed a release rate of 633 pounds/minute.

31.     Although Defendant provided EPA with a revised worst-case analysis in August

2014, which assumed a release of 11,355 pounds and a release rate of 625 pounds/minute,

Defendant's Risk Management Plan submitted in June 2016 assumed a 11,500-pound release and

a release rate of 300 pounds/minute.

32.     The Defendant's use of an incorrect release rate in the June 2011 Risk

Management Plan and the June 2016 Risk Management Plan resulted in an incorrect

determination concerning the greatest distance from the facility that ammonia would be present

in the atmosphere at 0.14 mg/L or more during a worst-case release scenario.  Underestimating a

worst-case release impact area can affect the adequacy of emergency response planning.

33.     Defendant's conduct alleged above in Paragraphs 30-32 was a violation of 40

C.F.R. § 68.25.

SECOND CLAIM FOR RELIEF - VIOLATION OF 40 C.F.R. § 68.65

34.     40 C.F.R. § 68.65 requires that Defendant document that the equipment used in its

ammonia refrigeration processes comply with recognized and generally accepted good

engineering practices ("RAGAGEP") or, for existing equipment designed and constructed in

accordance with codes, standards or practices no longer in general use, determine and document

that the equipment was designed, maintained, inspected, tested and operating in a safe manner.

35.     In light of the hazards posed by the mishandling of anhydrous ammonia, industry

trade associations have issued standards for the ammonia refrigeration industry.  For example,

the International Institute of Ammonia Refrigeration ("IIAR") publishes bulletins and guidance

documents for ammonia refrigeration systems, including, without limitation: IIAR Bulletin 109,

"Guidelines for IIAR Minimum Safety Criteria for a Safe Ammonia Refrigeration System (1997)" and IIAR Bulletin 114, "Guidelines for Identification of Ammonia Refrigeration Piping and System Components (1991)."  IIAR, in collaboration with the American National Standards Institute ("ANSI"), also issues "American National Standards" for ammonia refrigeration systems, including, without limitation, "Equipment, Design, and Installation of Closed-Circuit Ammonia Mechanical Refrigerating Systems" ("ANSI/IIAR 2-2008 (Add. B 2012)").  The American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE"), in collaboration with ANSI, also issues refrigeration standards, including, without limitation, the "Safety Standard for Refrigeration Systems" ("ANSI/ASHRAE Standard 15-2013").  Other organizations have also published guidelines for the safe operation of various processes.  The American Society of Mechanical Engineers published a guidance concerning the Identification of Piping Systems ("ASME A13.1-2007").  The National Fire Protection Association published a fire protection code ("NFPA 1 Fire Code 2012").  These standards and guidance represent RAGAGEP at the time of the Inspection.  Some of the standards and guidance have been updated since then.

36.     As alleged below, Kayem failed in a number of instances to meet the RAGAGEP standards in effect as of the Inspection.  Moreover, to the extent that any of the allegations relate to existing equipment designed and constructed in accordance with codes, standards or practices no longer in general use as of the date of the Inspection, on information and belief Kayem had not determined and documented that such equipment was nevertheless designed, maintained, inspected, tested and operating in a safe manner.

*Inadequate Labeling on Piping and Valves*

37.     RAGAGEP provides that a facility identify all piping in connection with an ammonia refrigeration process with respect to content and direction of flow, at sufficient intervals on straight piping runs to readily allow identification, and place labels close to valves, flanges, changes in direction, and branches.  See, e.g., ANSI/ASHRAE 15-2013 § 11.2.2; ANSI/IIAR 2-2008 (Add. B 2012) § 10.6; ASME A13.1-2007 § 3; IIAR Bulletin 109 § 4.7.6 (1997); IIAR Bulletin 114 (1991).

38.     During the Inspection, EPA inspectors determined that Defendant had inadequate labeling on piping and inadequate tagging of valves including, but not limited to, inadequate labeling of King Valve #2 in the machinery room, which was not labeled as a king valve, and inadequate labeling of certain ammonia pipes in the machinery room, certain components of the chilled water system, certain ammonia piping on the perimeter of the Facility, and the ammonia charge line.

39.     Defendant's conduct alleged above in Paragraph 38 was in violation of 40 C.F.R. § 68.65.

*Inadequate Signage on Doors Leading to Machinery Room and Concerning Identification of Ammonia Refrigeration System*

40.     RAGAGEP provides that a facility have a sign on all entrance doors to the ammonia refrigeration machinery room restricting entry to authorized personnel and to have other informative signs and emergency signs in accordance with NFPA 704.  E.g., ANSI/ASHRAE 15-2013 § 11.2.4; ANSI/IIAR 2-2008 (Add. B 2012) §§ 13.1.2.4 and 13.1.10.4. RAGAGEP also provides that a facility have a permanent sign displaying the name and address of the installer of the ammonia refrigeration equipment, the refrigerant number and the amount

of refrigerant in the system, the lubricant identity and amount, and the field test pressure applied.
E.g., ANSI/ASHRAE 15-2013 § 11.2.1; IIAR Bulletin 109 § 4.10.4.

41.     During the Inspection, EPA inspectors determined that (a) the two main doors
leading to the machinery room lacked NFPA hazard placards, (b) the three other doors leading to
the machinery room lacked all necessary signage, and (c) the sign inside the primary entrance to
the machinery room failed to identify the type of lubricant and the amount used.

42.     Defendant's conduct alleged above in Paragraph 41 was in violation of 40 C.F.R.
§ 68.65.

*Failure to Have Adequate Access to Ammonia Charge Line*

43.     RAGAGEP provides that a facility provide a clear and unobstructed approach and
space for inspection, service, and emergency shutdown of all serviceable components of
refrigeration machinery. E.g., ANSI/ASHRAE 15-2013 §§ 8.3, 9.12.1; ANSI/IIAR 2-2008 (Add.
B 2012) § 13.1.2.2.

44.     During the Inspection, EPA inspectors observed that the ammonia charge line
exited the building directly above a large electrical cable tray supporting wires from electrical
transformers, leaving no clear pathway for an ammonia supplier to access the charge line for
charging and unloading.

45.     Defendant's conduct alleged above in Paragraph 44 was in violation of 40 C.F.R.
§ 68.65.

*Failure to Adequately Seal Pipes Leading Out of Machinery Room*

46.     RAGAGEP provides that a facility tightly seal all pipes that pierce the walls of the machinery room.  E.g., ANSI/ASHRAE 15-2013 § 8.12(f); ANSI/IIAR 2-2008 (Add. B 2012) §§ 13.1.1.6, 13.1.5.2.

47.     During the Inspection, EPA inspectors observed that certain piping entering the machinery room was not tightly sealed to the walls.

48.     Defendant's conduct alleged above in Paragraph 47 was in violation of 40 C.F.R. § 68.65.

*Failure to Have Audible and Visual Alarms Inside the Machinery Room or Near the Entrance Doors to the Machinery Room*

49.     RAGAGEP provides that a facility provide visual and audible alarms inside the machinery room and outside each entrance to the machinery room. E.g., ANSI/ASHRAE 15-2013 § 8.11.2.1; ANSI/IIAR 2-2008 (Add. B 2012) § 13.2.1.2; NFPA 1 Fire Code 2012 §§ 53.2.3.1.2 and 53.2.3.1.3.

50.     During the Inspection, EPA inspectors observed that there were no visual or audible alarms inside the machinery room or near the entrance doors to the machinery room.

51.     Defendant's conduct alleged above in Paragraph 50 was in violation of 40 C.F.R. § 68.65.

*Failure to Adequately Label Certain Isolation Valves and to Provide Access to One of Those Valves with an Appropriate Permanent Work Surface*

52.     RAGAGEP provides that a facility provide prominent and easily readable identification of all main shut-off valves (king valves) and that all such king valves shall be readily accessible and operable, either directly or via a chain, from a permanent work surface.

E.g., ANSI/ASHRAE 15-2013 §§ 9.12.6, 11.2.2; IIAR 2-2008 (Add. B 2012) § 13.1.2.3; IIAR

Bulletin 109 § 4.10.3; NFPA 1 Fire Code § 53.2.4.2.

53.     During the Inspection, EPA inspectors observed that three isolation valves for the

High Temperature Receiver in the machinery room were not labeled as required and that one of

these valves was not readily accessible from a permanent work surface.

54.     Defendant's conduct alleged above in Paragraph 53 was in violation of 40 C.F.R.

§ 68.65.

*Failure to Have a Quick-Closing Valve on Line from Oil Pot to High Temperature Receiver*

55.     RAGAGEP provides that a facility have a self-closing or manual quick-closing

emergency stop valve connected to the oil drain point for any vessel equipped with an oil drain.

E.g., ANSI/IIAR 2-2008 (Add. B 2012) § 14.2.3.

56.     During the Inspection, EPA inspectors observed that there was no self-closing or

manual quick-closing emergency stop valve on the drain line from the oil pot located at the High

Temperature Receiver.

57.     Defendant's conduct alleged above in Paragraph 56 was in violation of 40 C.F.R.

§ 68.65.

*Failure to Locate Pressure Release Valve at Least 20 Feet from Inlet Air Ductwork*

58.     RAGAGEP provides that a facility locate the pressure release valve not less than

20 feet from any ventilation opening.  See, e.g., ANSI/ASHRAE 15-2003 § 9.7.8; ANSI/IIAR 2-

2008 (Add. B. 2012) § 11.3.6.3; NFPA 1 Fire Code § 53.2.3.3.12.

59.     During the Inspection, EPA inspectors observed that the pressure release valve

was located less than 20 feet from the ventilation inlet.

60.     Defendant's conduct alleged above in Paragraph 59 was in violation of 40 C.F.R. § 68.65.

*Failure to Equip the Machinery Room with Self-Closing and Tight-Fitting Doors*

61.     RAGAGEP provides that a facility equip the machinery room with tight-fitting doors that are self-closing if they opened into the building.   E.g., ANSI/ASHRAE 15-2013 §§ 8.11.12, 8.12(d); ANSI/IIAR 2-2008 (Add. B 2012) §§ 13.1.10.1, 13.1.10.2.

62.     During the Inspection, EPA inspectors observed that certain machinery room doors were not tight-fitting and that certain doors that led into other parts of the building were not self-closing.

63.     Defendant's conduct alleged above in Paragraph 62 was in violation of 40 C.F.R. § 68.65.

*Failure to Have Adequate Air Circulation in Machinery Room*

64.     RAGAGEP provides that a facility provide air circulation in the machinery room so that inlet air replaces air being exhausted.  RAGAGEP also provides that the machinery room have air openings for inlet air positioned to avoid recirculation of exhaust air and air inlets positioned in areas where refrigerant from a leak is unlikely to concentrate, in consideration of the location of the replacement air paths, refrigerating machines, and the density of the refrigerant relative to the air.  E.g., ANSI/ASHRAE 15-2013 § 8.11.4; ANSI/IIAR 2-2008 (Add. B 2012) § 13.3.3.2.

65.     During the Inspection, EPA inspectors observed that the machinery room ventilation system was not designed to provide a sufficient sweep of fresh air near machinery and to avoid recirculation of exhaust air (due to locating the air inlet on the outside wall in close proximity to an exhaust vent.)

66.    Defendant's conduct alleged above in Paragraph 65 was in violation of 40 C.F.R. § 68.25.

*Failure to Have a Shower and Eye Wash Station Outside the Principal Machinery Room Door*

67.    RAGAGEP provides that a facility have an eyewash station and body shower external to the machinery room and readily accessible via an exit. E.g., ANSI/IIAR 2-2008 (Add. B 2012) § 13.1.6; IIAR Bulletin 109 § 4.10.10.

68.    During the Inspection, EPA inspectors observed that Defendant did not have an eyewash station and a body shower located outside the machinery room in close proximity to the exit door.

69.    Defendant's conduct alleged above in Paragraph 68 was in violation of 40 C.F.R. § 68.65.

THIRD CLAIM FOR RELIEF – VIOLATION OF 40 C.F.R. § 68.67

*Failure to Identify Earthquakes as an Incident with a Potential for Catastrophic Consequences*

70.    40 C.F.R. § 68.67 required Defendant to perform a process hazard analysis ("PHA") to identify, evaluate, and control the hazards involved in the process including, without limitation, identify issues related to the siting of the facility.

71.    During the Inspection, EPA reviewed Defendant's PHA and Risk Management Plan from 2011 as well as a PHA from 2014 and determined that Defendant had failed to identify earthquakes as posing a potential risk even though the Facility is located in an area designated as at a moderate risk for earthquakes.

72.    Defendant's conduct alleged above in Paragraph 71 was in violation of 40 C.F.R. § 68.67.

14

FOURTH CLAIM FOR RELIEF – VIOLATION OF 40 C.F.R. § 68.69

 *Failure to Have Adequate Standard Operating Procedures for Ammonia Delivery*

73.     40 C.F.R.§ 68.69 required Defendant to develop and implement written operating procedures that provided clear instructions for safely conducting activities involved in each covered process and that addressed steps for each operating phase, including emergency shutdown operations and emergency operations.

74.     During the Inspection, EPA inspectors reviewed Kayem's "Ammonia Refrigeration System Bulk Delivery Charging Procedure" and determined that it did not include all the required elements, including procedures for each operating phase (such as emergency shutdown operations or emergency operations), operating limits, and safety and health considerations.

75.     Defendant's conduct alleged above in Paragraph 74 was in violation of 40 C.F.R. § 68.69.

FIFTH CLAIM FOR RELIEF – VIOLATION OF 40 C.F.R. § 68.73

*Failure to Calibrate Ammonia Detection System at Frequency Recommended by Manufacturer*

76.     40 C.F.R. § 68.73 required Defendant to (a) establish and implement written procedures to maintain the on-going integrity of process equipment, including, (b) inspect and test process equipment based on RAGAGEP and with a frequency consistent with manufacturer's recommendations and good engineering practices, and more frequently if determined necessary by prior operating experience, (c) document each inspection, and (d) correct deficiencies outside acceptable limits.

77.     After the Inspection, Defendant provided documents to EPA indicating that Defendant had calibrated its ammonia detection systems on an annual basis, despite the manufacturer's recommendation that the calibration be performed every six months.

78.     Defendant's conduct alleged above in Paragraph 77 was in violation of 40 C.F.R. 68.73.

*Failure to Adequately Maintain Piping on Roof of Facility*

79.     RAGAGEP provides that a facility apply primer-paint coating systems on areas of piping with an elevated risk of corrosion to provide pipe insulation with low thermal conductivity and low vapor permeability.  RAGAGEP also provides that a facility inspect uninsulated piping and, if corrosion is found, to clean the pipe to bare metal and paint with a rust preventive paint (or replace the pipe if badly corroded).  RAGAGEP also provides that insulated piping showing signs of vapor barrier failure should have the insulation removed and piping inspected.  E.g., ANSI/IIAR 2-2008 (Add. B 2012) App. H §§ H.6 and H.7; IIAR Bulletin 109 §§ 4.7.4 and 4.7.5.

80.     During the Inspection, EPA inspectors observed rusting on ammonia piping on the roof of the Facility and multiple sections of piping insulation covered with algae growth and missing insulation caps, thereby exposing the piping and insulation to moisture.

81.     Defendant's conduct alleged above in Paragraph 80 was in violation of 40 C.F.R. 68.73.

SIXTH CLAIM FOR RELIEF – VIOLATION OF 40 C.F.R. § 68.81

*Failure to Adequately Document Actions Taken to Prevent Recurrence of Incident That Could Have Resulted in Catastrophic Release of Ammonia*

82.     40 C.F.R. § 68.81 required Defendant to (a) investigate each incident that could reasonably have resulted in a catastrophic release of ammonia, (b) prepare a report at the

conclusion of such investigation, (c) have the report reviewed by all affected personnel whose

job tasks are relevant to the incident findings, and (d) promptly address and resolve the report

findings and recommendations and document any resolution and corrective action.

83.     Based on an Incident Investigation Report Form provided by Defendant to EPA,

there was an ammonia release from a malfunctioning valve on the roof of the Facility on March

22, 2014.  Defendant determined that the problem was caused by a loose packing nut, and

Defendant determined that the inspection schedule for valves should be revised to call for the

inspection and tightening of manual valve packing nuts every six months.  However, Defendant

had no documentation indicating that the proposed corrective action was in fact implemented.

84.     Defendant's conduct alleged above in Paragraph 83 was in violation of 40 C.F.R.

68.81.

SEVENTH CLAIM FOR RELIEF – VIOLATION OF 40 C.F.R. § 68.95

*Failure to Comply with Emergency Response Program Requirements of 40 C.F.R. § 69.95 at a
time When Defendant Was Not Included in Community Emergency Response Plan and When
Defendant Did Not Include Required Emergency Contacts in its Own Emergency Response Plan*

85.     Under the version of 40 C.F.R. § 68.90 that was in effect at the time of the

Inspection, Defendant was exempt from the emergency response program requirements of 40

C.F.R. § 68.95 only if (a) Defendant's employees were not expected to respond to accidental

releases of regulated substances, (b) Defendant was included in the community emergency

response plan developed under 42 U.S.C. § 11003, and (c) appropriate mechanisms were in place

to notify emergency responders when there is a need for a response.

86.     During the Inspection, EPA inspectors determined that Defendant was not in

compliance with the requirements of 40 C.F.R. § 68.95.  EPA inspectors also determined that

although Defendant's employees were not expected to respond to accidental releases of regulated

substances, Defendant was not included in the community emergency response plan and did not

include in its Emergency Response Plan MassDEP's 24-hour emergency number, or contact

information for the National Response Center.

87.     Defendant's conduct alleged above in Paragraph 86 was in violation of 40 C.F.R.

68.95.

**RELIEF SOUGHT**

WHEREFORE, Plaintiff, the United States, respectfully prays that this Court provide the

following relief:

1.     Order Defendant to pay a civil penalty for violations of Section 112(r)(7) of the

CAA in the amount of $37,500 per day for each violation that occurred from January 12, 2009

through November 2, 2015 and in the amount of $99,681 per day for each violation that occurred

on or after November 2, 2015;

2.     Award the United States its costs of this action; and

3.     Grant the United States such further relief as this Court may deem just and proper.

Respectfully submitted,

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice

/s/ Donald G. Frankel
DONALD G. FRANKEL
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
408 Atlantic Avenue
Suite 236
Boston, MA 02110
(617) 748-3512

ANDREW E. LELLING
United States Attorney
District of Massachusetts

SUSAN POSWISTILO
Assistant United States Attorney
District of Massachusetts
United States Attorney's Office
John Joseph Moakley United States Courthouse
Suite 9200
1 Courthouse Way
Boston, MA 02210

Of Counsel:

CHRISTINE FOOT
Enforcement Counsel
EPA Region 1
OES Regulatory Legal Office
5 Post Office Square
Suite 100 (Mail Code OES 04-2)
Boston, MA 02019-3912